IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 14, 2013

## STATE OF TENNESSEE v. TIMOTHY SHANE HIXSON

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1676    Cheryl A. Blackburn, Judge**

**No. M2012-02357-CCA-R3-CD - Filed August 14, 2013**

The defendant, Timothy Shane Hixson, appeals his Davidson County Criminal Court jury conviction of aggravated robbery, challenging the sufficiency of the convicting evidence and the exclusion of certain evidence.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Chelsea Nicholson (on appeal); and Jack Byrd (at trial), Nashville, Tennessee, for the appellant, Timothy Shane Hixson.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On June 15, 2010, the Davidson County grand jury charged the defendant, James Kevin Rogers, and Mollie Elizabeth Pasquini with one count of aggravated robbery. The trial court conducted a jury trial in April 2012.

At trial, Shamal Harley, the victim, testified that, in February 2010, he was a student at Nashville Auto Diesel College.  On the evening of February 20, he attended a graduation party on campus, and between 10:00 p.m. and midnight, he began walking to his residence, which he estimated to be approximately one block from the school.  En route to his residence, Mr. Harley encountered a Chevrolet Avalanche on the side of the road, and he noticed three persons inside the vehicle.  Mr. Harley had never seen any of them prior to that

night. The driver of the vehicle and the front-seat passenger were engaged in an argument, and the driver asked Mr. Harley "could he have [Mr. Harley's] opinion on it." Mr. Harley briefly spoke with the driver. During this brief conversation, the front-seat passenger exited the vehicle; Mr. Harley presumed that the passenger was urinating.

After Mr. Harley had answered the driver's question, he turned and began to walk away. He had walked approximately five steps when the front-seat passenger grabbed him from behind and demanded his "F'ing wallet." Mr. Harley testified that he "started to tussle with" the assailant, and in the process, he "reached up and touched the knife" that the perpetrator was holding to Mr. Harley's neck. Mr. Harley testified that it was a real knife, but he was unable to describe the knife. Once he realized the assailant was holding a knife, Mr. Harley quit struggling and gave the robber his wallet. He stated that the wallet contained no cash, but it did contain his identification, social security number, bank cards, and various other cards.

Mr. Harley stated that the driver never left the car, but the back-seat passenger exited the vehicle and "said something" although Mr. Harley did not recall what she said or whether she was speaking to him or to the robber. After taking Mr. Harley's wallet, the robber told Mr. Harley to walk toward the school. The robber and the back-seat passenger returned to the vehicle, and the Avalanche left the area. At that point, Mr. Harley returned to his residence and called the police to report the robbery. A uniformed patrol officer arrived shortly thereafter, and Mr. Harley gave a full report to the officer, describing the occupants of the vehicle and the vehicle itself. Mr. Harley also mentioned that he had noticed a wheelchair in the back seat of the vehicle. After speaking with the officer for "maybe five or ten minutes," the officer informed him that he might "have the suspects." Mr. Harley rode with the police officer to a spot approximately one to two miles away, where a Chevrolet Avalanche was parked. A person was in handcuffs, and other police officers were present. Mr. Harley recognized the Avalanche as the same vehicle in which the robber was riding, noting that the vehicle was distinguishable by its after-market rims. Mr. Harley also recognized all three of the vehicle's occupants. The officers on the scene had recovered Mr. Harley's wallet, but his social security card and his Regions bank card were missing.

Mr. Harley stated that, when he arrived at the scene, he recognized the driver, the front-seat passenger, and the back-seat passenger. Mr. Harley positively identified the defendant as the front-seat passenger and as the man who robbed him. He also positively identified the driver, James Rogers, and the back-seat passenger, Mollie Pasquini.

On cross-examination, Mr. Harley admitted that the robbery might have taken place at a later time, estimating that it occurred between 10:00 p.m. and 2:00 a.m. Mr. Harley denied that he had been drinking or "doing anything else" while at the graduation party. Mr.

Harley denied seeing the defendant using a cane. Mr. Harley admitted that he never saw the defendant brandish a knife, but he did "reach[] up" and "felt what [he] thought was a knife."

On redirect examination, Mr. Harley described the way in which the defendant grabbed him, stating "[w]hen I touched the knife, that's when I pretty much gave up at that point because I noticed it was a real knife."

Officer Bradley Nave with the Metropolitan Nashville Police Department ("Metro") testified that, on February 20, 2010, he heard a call on dispatch at approximately 2:00 a.m. regarding a robbery and a description of both the vehicle involved and the occupants of the vehicle. The dispatcher also mentioned that the robbery victim reported seeing a wheelchair in the back of the vehicle. About one hour later, Officer Nave was dispatched to Granada Avenue where a vehicle matching the description of the Chevrolet Avalanche had been reported. Officer Nave and Metro Detective Jack Stanley approached the vehicle, and they noticed a wheelchair in the backseat of the vehicle.

Officer Nave discovered only two persons inside the vehicle, later identified as the defendant, who was seated in the passenger's seat, and James Rogers, the driver. Officer Nave identified the defendant in court as the man seated in the passenger's seat of the vehicle. Based on his conversation with the defendant and Mr. Rogers, Officer Nave approached the house nearest the vehicle and encountered Ms. Pasquini inside the house.

Officer Nave explained that Metro Officer Gutrow had responded to Mr. Harley's 9-1-1 call and had written the offense report but that Officer Gutrow had retired and moved to the Dominican Republic. Once Officer Nave was convinced that they had located the suspects who had robbed Mr. Harley, Officer Nave contacted Officer Gutrow to ask him to bring Mr. Harley to the scene to identify the suspects. Following Mr. Harley's positive identification of the suspects at the scene, Officer Nave and his fellow officers arrested the defendant, Mr. Rogers, and Ms. Pasquini. Following the arrest of the suspects, Detective Stanley conducted a search of the vehicle and pointed out to Officer Nave a knife and some loose credit cards found inside the vehicle.

On cross-examination, defense counsel asked Officer Nave whether he recalled seeing the defendant with a cane, and Officer Nave responded that it "sound[ed] familiar" but that he did not "remember the details about it." Officer Nave also acknowledged that, on the defendant's arrest report on February 20, he indicated the defendant was "disabled" and that he "would put that if that's what [the defendant] told [him]."

Metro Detective Jack Stanley testified that he and Officer Nave arrived on Granada Avenue at approximately the same time on February 20. Detective Stanley stated

that he observed a vehicle and two occupants matching the description given by the dispatcher. Detective Stanley also noticed the wheelchair located behind the driver's seat. He asked the driver, Mr. Rogers, to step out of the vehicle, and Mr. Rogers explained that he needed his wheelchair due to a disability. Once both Mr. Rogers and the defendant had been removed from the vehicle, Detective Nave noticed a pocket knife located on the floorboard in the front passenger's area "almost up under the . . . seat." Detective Nave also noticed, in plain view, some credit cards containing the victim's name. The victim arrived on the scene a short time later and identified the suspects. At trial, Detective Nave identified the defendant and Mr. Rogers as the men arrested on February 20.

On cross-examination, Detective Nave admitted that he recalled seeing the defendant with a cane.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, the defendant elected to testify. *See Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999). The defendant testified that, on December 5, 2009, he suffered a broken leg when a car crashed into his residence. The defendant's prescription for pain medication had elapsed, so he contacted his girlfriend to accompany him to an area of town where he could purchase pain pills on the street. Because his girlfriend was too intoxicated to drive, she told the defendant to take her vehicle, which he did, even though he did not have a driver's license. The defendant drove to an area near the Nashville Auto Diesel College and encountered Mr. Harley walking down the street. The defendant asked Mr. Harley if "he know[s] where [the defendant] can get any pills," and, according to the defendant, Mr. Harley responded that his "buddy" had some for $10 each. The defendant told Mr. Harley that he would like to purchase three pills, and Mr. Harley explained that he needed the $30 up front. When the defendant was hesitant to give him the cash, Mr. Harley offered to let the defendant hold his wallet until he returned with the pills. The defendant acquiesced, giving Mr. Harley $30 and accepting his wallet in return. Mr. Harley instructed the defendant to "make the block a couple of times," and Mr. Harley left.

The defendant testified that he drove around the area for 15 to 20 minutes but that he began to worry that he would be stopped by law enforcement officers because he was in an area known for drug dealing. The defendant then decided to drive to Granada, where he encountered Mr. Rogers, known as "Wheelchair," sitting in his new Chevrolet Avalanche. Mr. Rogers offered to take the defendant for a ride in the vehicle, and the defendant climbed into the front passenger's seat. At that time, Ms. Pasquini exited her residence on Granada and climbed into the backseat of the vehicle, where she "pass[ed] out" due to intoxication.

At the defendant's request, Mr. Rogers drove to the area of the Nashville Auto

-4-

Diesel College, where the defendant spotted Mr. Harley. The defendant exited the vehicle with a buck knife "on his side," but he testified that he never pulled the knife on Mr. Harley. The defendant asked Mr. Harley if he had the pills, and Mr. Harley asked if the defendant had his wallet. The defendant held out the wallet, and, according to the defendant, Mr. Harley grabbed the wallet and attempted to run away. The defendant, however, did not release the wallet, causing him to fall on top of Mr. Harley. At that point, Ms. Pasquini exited the vehicle and began yelling for Mr. Harley to stop. Mr. Harley got up and ran off down the street, leaving his wallet with the defendant. Ms. Pasquini helped the defendant back into the vehicle. The trio returned to Granada, and Ms. Pasquini went into her residence. The defendant and Mr. Rogers remained in the vehicle, where the defendant examined the contents of Mr. Harley's wallet. At that time, law enforcement officers arrived, and the defendant was placed under arrest a short time later.

On cross-examination, the defendant admitted that, in the past 10 years, he had been thrice convicted of aggravated burglary, as well as burglary, burglary of an automobile, theft of property valued over $1000, and unauthorized use of a motor vehicle.

Based on this evidence, the jury convicted the defendant as charged of aggravated robbery. Following a sentencing hearing, the trial court imposed a sentence of 24 years and ordered that it be served consecutively to the defendant's parole violation sentence.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the evidence adduced at trial was insufficient to support his conviction and that the trial court erred by excluding certain evidence at trial. We consider each claim in turn.

*I. Sufficiency*

The defendant contends that the evidence is insufficient to support his conviction of aggravated robbery because he was physically unable to commit the crime. In addition, the defendant argues that the proof failed to establish that he displayed a weapon, as required by statute.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a

combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a]ggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103.

Here, the proof adduced at trial established that the defendant attacked Mr. Harley from behind, placing a knife against his neck and demanding Mr. Harley's "[f]'ing wallet." Mr. Harley described his assailant and the vehicle in which he was riding, and based on those descriptions, law enforcement officers located the defendant and his cohorts a short time later, finding both a knife and the contents of Mr. Harley's wallet in the vehicle in which the defendant was a passenger. Mr. Harley positively identified the defendant as the man who had robbed him. Although the defendant claims that he was walking with the aid of a cane and could not have robbed the victim in the way in which the victim claimed, the jury heard the defendant's testimony and clearly rejected it, as was their prerogative.

The defendant also alleges that the evidence was insufficient to support his conviction because the State failed to establish that the defendant used or displayed an item in a fashion designed to lead the victim to reasonably believe it was a deadly weapon, the modality of aggravated robbery as charged in the present case.

The aggravated robbery statute clearly contemplates the scenario in which a robbery is accomplished not by the brandishing of an actual deadly weapon but by some action on the part of the defendant to lead the victim to reasonably believe that the defendant is armed with a deadly weapon. This court has affirmed convictions of aggravated robbery when the defendant's demand for money coupled with his maintaining a hand in his pocket, even when the hand was not positioned to evoke the image of a gun or any other weapon, led

the victim to reasonably believe the defendant was armed, often by verbally threatening to harm the victim. *See, e.g., State v. Aaron Cooper*, No. 01C01-9708-CR-00368, slip op. at 7 (Tenn. Crim. App., Nashville, Sept. 29, 1998) (defendant "held his hand in the waistband of his pants 'as if he had a weapon,' and said . . . 'Don't make me have to hurt you'"); *State v. Frederick Corlew*, No. M2001-00842-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Nashville, Nov. 1, 2002) (defendant kept "his right hand . . . in his right pants pocket as he came in and [it] remained there as he walked past the cash register and even after he came around the counter and was standing with the victim, demanding her to 'open the register'"). We have observed that the "common threads" in those cases where no actual deadly weapon was displayed "are: 1) a hand concealed in an article of clothing; and 2) a threat – express or implied – that caused the victim to 'reasonably believe' the offender had a deadly weapon and was not opposed to using it." *State v. Monoleto D. Green*, No. M2003-02774-CCA-R3-CD, slip op. at 10 (Tenn. Crim. App., Nashville, May 5, 2005).

In the instant case, although the victim never actually saw the knife, he felt it, which is even stronger evidence of a deadly weapon than a hand concealed in clothing accompanied by a threat. In addition, the fact that Detective Stanley located a knife on the floorboard in the front passenger's seat area of the Avalanche, as well as the defendant's own admission that he had a knife "on his side" when he approached Mr. Harley, could reasonably lead jurors to find that the defendant used a knife to rob Mr. Harley.

Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence supports the defendant's conviction of aggravated robbery.

## II. Exclusion of Evidence

The defendant contends that the trial court erroneously limited his cross-examination of Mr. Harley. Specifically, defense counsel sought to question Mr. Harley about statements he allegedly made to Officer Gutrow and which Officer Gutrow included in the defendant's arrest warrant. The trial court sustained the State's objection to this attempt, stating "[y]ou're cross-examining him about a statement that is not [Mr. Harley's]."

We are unable to review the lower court's exclusion of this testimony because the arrest warrant is not included in the appellate record. As our supreme court has observed,

> In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner. When it is a document or exhibit, this is done by having the exhibit marked for identification only and

not otherwise introduced.

*State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986). Without a copy of the warrant in the record, it is impossible to conduct a meaningful review of this issue. *See State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997) ("Not only does [an offer of proof] ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded."); *see also* Tenn. R. Evid. 103. Accordingly, the defendant has waived this issue.

### *III. Conclusion*

The evidence is sufficient to support the defendant's conviction of aggravated robbery, and we presume that the trial court correctly excluded testimony related to the arrest warrant in light of the defendant's failure to submit a copy of the warrant to this court. In light of the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE